## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### CENTRAL ISLIP

| | |
|---|---|
| NANCY BONO, individually and on behalf of all others similarly situated, | 2:24-cv-03026 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| ALDI INC., | |
| Defendant | Jury Trial Demanded |

Nancy Bono ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## I.    DEMAND FOR "REAL INGREDIENTS" WITHOUT ADDITIVES

1.    According to a food industry executive, "Consumers are reading product labels more closely, and we are seeing the effects of a simple food movement when it comes to ingredients."

2.    This is because shoppers feel more comfortable when foods consist of the types of basic ingredients they have in their refrigerators and cupboards, instead of complex ingredients, made in laboratories by chemists or through industrial machinery.

3.    Consumer research company Mintel attributed this demand for "real ingredients" in part due to media attention focused on lack of transparency in the

food industry.[1]

4.    This sentiment is reflected in the public's growing aversion to additives.

5.    Additives refer to non-food ingredients created in laboratories to fulfill various functions, such as facilitating processing ("processing aids"), improving appearance ("colorants"), creating or enhancing taste ("flavorings"), and slowing deterioration ("preservatives").

6.    Commentators have observed that "Our foods are laden with additives that are meant to enhance flavor, color and shelf life that research has shown are either bad for people to consume or inconclusively so."[2]

7.    A recent consumer survey by the International Food Information Council ("IFIC") found that almost thirty percent of the public consider additives in food a top concern.[3]

8.    This aversion to additives is based on the belief that chemicals of any kind are not necessarily safe and may pose health risks.[4]

---

[1] Lynn Dornblaser, Director, Innovation & Insight, Mintel, "Clean Label: Why this Trend is Important Now," 2017.

[2] Frank Giustra, You Might Be Surprised by What's in Your Food, Modern Farmer, Feb. 8, 2021.

[3] Tom Neltner, Environmental Defense Fund, Chemicals Policy Director, Chemicals in Food Continue to be a Top Food Safety Concern Among Consumers, Food Navigator, Sept. 20, 2021.

[4] Cary Funk et al., Public Perspectives on Food Risks, Pew Research Center, Nov. 19, 2018.

9.     This behavior makes sense, as studies have confirmed negative health effects linked to foods laden with chemical additives.[5]

10.    To avoid the types of additives and potentially unhealthy foods, nutrition professionals have recommended that consumers seek foods that describe its components and ingredients indicated with the term, "100% _____ ," because this means the food contains "completely" or "entirely" the ingredient which follows, without anything else added.[6]

11.    In seeking to help consumers avoid highly processed foods and promote healthy dietary practices, medical professionals, such as Dr. Sal Lacagnina emphasize that "[T]he goal is to choose foods with as few ingredients as possible."[7]

12.    Other nutritionists and dietitians agree that "The more ingredients in a food product, the more likely it won't be good news for health," with the corollary rule of thumb that "the fewer [ingredients], the better!"[8]

13.    This was confirmed by a recent Lifestyle of Health and Sustainability

---

[5] Bhavana Kunkalikar, Processed Danger: Industrial Food Additives and the Health Risks to Children, News-Medical.net, May 23, 2023 (citing study in the Journal of the Academy of Nutrition and Dietetics in which researchers explored potential adverse health effects due to the use of industrial additives in processed food).

[6] Cambridge Dictionary, One Hundred Percent; YourDictionary, One Hundred Percent

[7] Dr. Sal Lacagnina, Dr. Sal: Buy, Eat Food With Few Ingredients, The News-Press, June 27, 2016.

[8] Kristin Kirkpatrick, Can Packaged Foods Be Healthy? A Dietitian Breaks Down the Ingredients, Today.com, Sept. 23, 2019.

("LOHAS") study, which tracks consumer attention to health and wellness.[9]

14.   The LOHAS findings indicated that eight of ten consumers are choosing to "buy products with fewer ingredients that they can understand and pronounce."[10]

15.   These consumer preferences are driving change, as companies "are winnowing their ingredient lists to as few elements as possible."[11]

16.   Moreover, the focus on fewer ingredients and greater transparency has caused a growing number of companies to list their ingredients on "the principal display panel," or front label, since it is not required to relegate this to "the information panel" on the back of the package. 21 C.F.R. § 101.4(a)(1).

## II.   LEGAL BACKGROUND

17.   In response to an unregulated environment, where companies marketed their foods as containing the fruits and 100% fruit juice valued by consumers, yet substituted ingredients of lesser economic and nutritive value, the Pure Food and Drug Act of 1906 established rules to protect the public.

18.   These requirements were strengthened by the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938, which sought to prohibit "misbranding" and

---

[9] Ethos Team, Marketing to the LOHAS Food and Beverage Consumer: A Strategic Guide, Ethos.

[10] Blog, Almost 80% of Consumers Look For Products With Fewer Ingredients, NutriFusion.

[11] CPG Selling Point: Fewer Ingredients, National Association of Convenience Stores ("NACS"), Aug. 11, 2016.

economic adulteration with respect to the nation's food supply. 21 U.S.C. § 301 *et seq.*[12]

19.   This State adopted these laws through its Agriculture and Markets Law ("AGM") and accompanying regulations. AGM § 198 *et seq.*, Article 17, Adulteration, Packing, and Branding of Food and Food Products.[13]

20.   New York considered these requirements for the sale and marketing of foods necessary to prevent unscrupulous and fraudulent practices, facilitate selection and consumption of food according to sound dietary and nutritional principles, and improve its citizens' overall health. AGM § 3.

21.   The Legislature deemed these laws "an exercise of the police power of the state and a discharge of its obligations for the promotion of the general welfare," requiring they "receive a liberal interpretation and application in furtherance of the aforesaid policy and purposes," and enforced by methods including "individual enterprise." AGM § 3.

---

[12] "Misbranded" is the statutory term for labeling that is false and/or misleading, while "adulterated" means to "render (something) poorer in quality by adding another substance, typically an inferior one."

[13] Official Compilation of Codes, Rules and Regulations of  the State of New York ("N.Y.C.R.R."), Title 1, Department of Agriculture and Markets, Chapter VI, Food Control, Subchapter C, Food and Food Products (Article 17, Agriculture and Markets Law), 1 N.Y.C.R.R. § 250.1 *et seq.*; 1 N.Y.C.R.R. § 259.1(a) (adopting Parts 100, 101 and 102 of Title 21); 1 N.Y.C.R.R. § 250.1(a) (adopting all "Federal definitions and standards").

22.   Congress empowered the Food and Drug Administration ("FDA") to develop rules, "premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[14]

23.   Given that manufacturers of that era were using advanced scientific knowledge to substitute ingredients of lesser economic and nutritive value for the wholesome ingredients sought by the public, this was a daunting task.

24.   These principles were especially important for commonly consumed foods, for which "standards of identity" were established.

25.   These standards protected consumers, by ensuring a food's characteristics, ingredients, nutritive value, and production processes were consistent with what they expected.

26.   Since "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging" to provide nutritive and sensory information, the labeling of such foods had to provide specific, complete, and truthful information, lest it be considered "misbranded."[15]

---

[14]   Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

[15]   Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Product Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326.

### III. PRODUCT CONTAINS MORE THAN JUST PEACHES AND 100% FRUIT JUICE

27.   To appeal to the growing number of consumers seeking foods that "use 'real' ingredients, which is to say, those that are recognizable" and "naturally occurring," consisting of components entirely of those ingredients, instead of lesser valued substitutes and manufactured chemical compounds, ALDI INC. ("Defendant") sells "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups ("Product"), visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices.[16]



28.   However, the fine print ingredient list on the lowest part of the back of

---

[16]   John Unrein, Ingredients on Alert: How Consumer Demand is Influencing Baking's Future, Bake Mag, Aug. 19, 2020.

the packaging, which lists the components in order of predominance by weight, along with "In 100% Fruit Juice From Concentrate" beneath "Yellow Cling Diced Peaches," reveals purchasers do not receive only the promised peaches packed "In 100% Fruit Juice," but mostly, or at least, a significant percentage, of undisclosed ingredients. 21 C.F.R. § 101.4(a)(1).



29.     While the first and most predominant ingredient is "Diced Peaches," the second through fourth ingredients are "Water, White Grape Juice Concentrate, [and] Lemon Juice Concentrate," followed by the fifth and sixth ingredients of "Ascorbic Acid To Promote Color Retention, [and] Citric Acid."

A. <u>Added Water</u>

30.     The amount of the second ingredient of water exceeds any other component other than peaches.

31.     The amount of water is greater than any juice ingredient, and more than

8

the "100% fruit juice" promoted on the front label.

32.   Since the third and fourth ingredients of "White Grape Juice Concentrate [and] Lemon Juice Concentrate" contain water, *infra*, the amount of water appears to exceed all other ingredients combined, other than peaches.

33.   Though water is a natural component of the peaches and 100% fruit juice emphasized on the front label, the added water is from none of these sources.

34.   The cost of water is substantially less than peaches and 100% fruit juice.

35.   Water lacks the nutrients, such as fiber, vitamin C, and antioxidants, of peaches and 100% fruit juice.

36.   Water lacks the taste of peaches and 100% fruit juice, because it is defined as having no taste.

37.   The significant amount of added water means the consumer receives less of the promised peaches and 100% fruit juice.

B. Added Juice Concentrates

38.   The third and fourth ingredients of "White Grape Juice Concentrate [and] Lemon Juice Concentrate" are not what consumers expect when promised "100% fruit juice."

39.   Nor would consumers recognize or comprehend how these juice concentrates are made, through heavy, industrial machinery.

40.   The process begins with real, "100% Fruit Juice," that is steam heated in

a vacuum to evaporate the water.

41.   The resulting slushy residue, or "juice concentrate," can now be stored for years, and shipped around the world.

42.   When the concentrates are eventually used, they are "reconstituted."

43.   However, instead of using water from the fruits and juices used to create them, regular water is added, from a local source.

44.   Finally, the juice concentrate undergoes heat pasteurization.

45.   According to Caroline West Passerrello, a registered dietitian nutritionist and a spokesperson for the Academy of Nutrition and Dietetics, making juice concentrate causes "100% Fruit Juice" to lose its volume, fiber, natural fruit flavors, and essential, though heat sensitive nutrients, like vitamin B and C, yet keep its sugar and calories.

46.   For this reason, Vasanti Malik, a research scientist in the Department of Nutrition at the Harvard T.H. Chan School of Public Health, says that "people should view fruit concentrate as an added sugar, similar to high-fructose corn syrup."

47.   Reconstituted juice concentrates are recognized as lacking the sensory attributes of taste, odor, and aroma of "100% Fruit Juice" that is not from concentrate.[17]

---

[17] Brunda et al., Comparative Study of Not From Concentrate and Reconstituted From Concentrate of Pomegranate Juices on Nutritional and Sensory Profile, Food

48. Government experts reached similar conclusions, because "[C]oncentration via evaporation uses more drastic time-temperature conditions than pasteurization, creating considerable changes in flavor and sensory profiles of concentrated juices."[18]

49. The intense processing for juice concentrates requires that manufacturers "use [undisclosed] additives like flavor packs, which are artificial compounds made from fruit byproducts," among other manufactured substances, to try and "restore" its "100% Fruit Juice" taste and qualities.[19]

50. In the production of juice concentrates, the processing strips away the elements which provide much of the natural fruit flavor "100% fruit juice" is known for.

51. For decades, the juice concentrate industry has "captured" the essences, essential oils, and other volatile compounds released during the steam evaporation.

52. These "flavor packs" are then added back to the "full flavor concentrates," and not required to be disclosed on the labeling.

---

Science and Technology International, 2022; 28(1):93-104 (describing "better antioxidant activity, iron bioavailability, anthocyanin content and sensory attributes were captured in pomegranate NFC juices over RFC juices.").

[18] U.S. International Trade Commission ("USITC"), Lemon Juice From Brazil and South Africa, Inv. Nos. 731-TA-1578-1579 (Final), Publication 5403, Feb. 2023 at 18.

[19] Lisa Wartenberg, MFA, RD, LD, What Is Juice Concentrate, and Is It Healthy?, Healthline.com, July 25, 2023.

53.   According to one company which only uses "100% Fruit Juice," the quality of fruits used to make "juice concentrate" "doesn't really matter…Since it's all getting condensed," instead of having the same "high-quality as something you'd juice and use outright."[20]

54.   The cost of juice concentrate is substantially less than peaches and 100% fruit juice.

55.   Juice concentrate lacks the nutrients, such as fiber, vitamin C, and antioxidants, of peaches and 100% fruit juice.

56.   Juice concentrate lacks the taste of peaches and 100% fruit juice because to the extent their essences, essential oils, and volatile compounds are "restored," it is unable to recreate the unique flavor of unconcentrated 100% fruit juice.

57.   The significant amount of added juice concentrates means the consumer receives less of the promised peaches and 100% fruit juice.

C.  Added Flavoring and Seasoning

58.   While the Product's ingredient list does not disclose any added flavoring ingredients, i.e., "natural flavor," "good manufacturing practices" ("GMP") and relevant regulations permit companies to "add back" the volatile oils, essences, and other aromatic compounds, which are stripped from juice concentrates during steam

---

[20] Spindrift, Real Fruit, Never From Concentrate.

evaporation, without disclosing this to consumers through the ingredient list or in a food's "statement of identity."

59.   In canned or packaged peaches, lemon juice is a widely recognized seasoning ingredient. 21 C.F.R. § 145.170(a)(1)(iii) and 21 C.F.R. § 145.170(a)(4)(i).

60.   The use of the "added back" volatile compounds for flavoring to the juice concentrates, and lemon juice concentrate for seasoning, means that consumers appear to receive only peaches and 100% fruit juice, which may taste like only peaches and 100% fruit juice, even though this is false.

D. <u>Added Synthetic Preservatives</u>

61.   Until the early twentieth century, ascorbic acid and citric acid were obtained from fruits such as peaches and 100% fruit juice.

62.   However, neither the ascorbic acid nor citric acid used in the Product is from peaches or 100% fruit juice.

63.   Ascorbic acid is the synthetic version of vitamin C, obtained from genetically modified corn. 21 C.F.R. § 182.3013 ("Chemical Preservatives"); 7 C.F.R. § 205.605(b)(6) ("Synthetics allowed.").

64.   The glucose from the corn undergoes chemical reactions including hydrogenation, with synthetic substances, then is converted to sorbitol, before ascorbic acid is made.

65.   Like ascorbic acid, citric acid is also "a major industrial chemical," "made from *Aspergillus niger* (aka: black mold)…that comes [usually] from sugar sourced from genetically modified corn or beets."[21] 21 C.F.R. § 184.1033.

66.   Recovering citric acid requires numerous chemical reactions with synthetic mineral salts and reagents.

67.   First, the filtrate is treated with lime solution or calcium carbonate.

68.   This chemical reaction forms tri-calcium citrate tetra hydrate, treated with sulfuric acid in acidolysis reactors.

69.   Then, the solution is purified by passing through activated charcoal columns and ion exchangers.

70.   Finally, it is evaporated to recover citric acid.

71.   Ascorbic acid and citric acid are recognized preservatives, a type of additive which slows deterioration of food.

72.   The FDA, aware of consumer desire for foods without preservatives, advised the public to check if a food's ingredients include the chemical additives of "[A]scorbic acid [and] citric acid."[22]

73.   These ingredients are required to be followed by a description of their

---

[21] Nelson, What is Citric Acid, and is it Harmful to Your Health?, Branch Basics, Nov. 11, 2020.
[22] Overview of Food Ingredients, Additives & Colors, Apr. 2010.

function, so consumers can make informed choices, "e.g., 'preservative', 'to retard spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention'." 21 C.F.R. § 101.22(j).[23]

74.   Ascorbic acid and citric acid are "chemicals that, when added to food, tends to prevent or retard deterioration thereof" and function in this capacity in the Product. 21 C.F.R. § 101.22(a)(5).

75.   Ascorbic acid and citric acid are used in the Product as acidulants, chelating agents, antimicrobial agents, buffering agents, antioxidant additives, and anti-browning agents.

76.   As acidulants, ascorbic acid and citric acid increase the acidity of the Product, which lowers its pH.

77.   This creates conditions which inhibit microbial spoilage from bacteria, yeasts, and molds.

78.   The addition of ascorbic acid and citric acid means that if any microorganisms survive processing and heat pasteurization, they will be neutralized, and the Product will be preserved by being stable and consumable for a longer period after it is first made, and after opened for consumption.

79.   As chelating agents, ascorbic acid and citric acid remove traces of heavy metals present in peaches and 100% fruit juice.

---

[23] The label complies in this respect for the designation of a function of ascorbic acid.

80.   This prevents premature oxidation, which would degrade the Product's taste, color, and appearance.

81.   As antimicrobial agents, the low pH of ascorbic acid and citric acid helps to prevent microbial growth, thereby preventing spoilage and preserving freshness.

82.   As buffering agents, ascorbic acid and citric acid help to maintain a constant pH, preventing batch-to-batch inconsistencies in the Product.

83.   The result of the constant pH is a product lasting longer on the shelves and after being opened, because it will be more stable and less prone to microbial spoilage.

84.   As antioxidant additives, ascorbic acid and citric acid are oxygen scavengers and prevent oxidation, preventing rapid deterioration upon exposure to air or changes in storage conditions.

85.   As anti-browning agents, ascorbic acid and citric acid maintain the natural, light color of peaches and 100% fruit juice, through preventing oxidation, allowing the Product to remain visually appealing longer than it otherwise would be.

86.   Beyond their preservative functions, ascorbic acid and citric acid are used in the Product to provide a fruity and tangy taste.

87.   This is necessary, in part, because the highly processed juice concentrates lose some of their natural fruit flavor, notwithstanding the likely addition of volatile essences, oils, and other compounds.

88.   The use of ascorbic acid and citric acid make it appear to consumers that the Product contains (1) more peaches and 100% fruit juice, and/or (2) higher quality ingredients, in terms of freshness, taste and/or nutritive value.

## IV.  LABELING IS MISLEADING

89.  The Product is "adulterated" and misleads consumers because a "valuable constituent has been [] in part omitted or abstracted," since the amount and/or quantity of peaches and 100% fruit juice is less than it otherwise would be in the absence of the added water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or preservatives. 21 U.S.C. § 342(b)(1); AGM § 200(7).

90.  The Product is "adulterated" and misleads consumers because "substance[s] ha[ve] been substituted wholly or in part []for [peaches and/or 100% Fruit Juice]," including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasonings, and/or preservatives. 21 U.S.C. § 342(b)(2); AGM § 200(8).

91.  The Product is "adulterated" and misleads consumers because "inferiority has been concealed" through the "added back" flavorings to the juice concentrates, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or preservatives, which are necessary, in part, because reconstituted juice concentrates are negatively impacted with respect to their nutritive, sensory,

and organoleptic attributes, and such attributes cause it to be of lower quality than juice which is not concentrated. 21 U.S.C. § 342(b)(3); AGM § 200(9).

92.   The Product is "adulterated" and misleads consumers because "substance[s] ha[ve] been added [] or mixed or packed therewith so as to increase its bulk or weight," which include water and juice concentrates, even though the front label statement that the peaches are packed "In 100% Fruit Juice" does not disclose this fact. 21 U.S.C. § 342(b)(4); AGM § 200(10).

93.   The Product is "adulterated" and misleads consumers because "substance[s] ha[ve] been added [] or mixed or packed therewith so as to…make it appear better or of greater value than it is," which include the "added back" flavorings to the juice concentrates, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or preservatives, which improve its nutritive, sensory, and organoleptic attributes, so that purchasers buying peaches packed "In 100% Fruit Juice" will be unable to discern it is packed in mainly other, lesser valued ingredients. 21 U.S.C. § 342(b)(4); AGM § 200(10).

94.   The Product is "misbranded" and misleads consumers because "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, causes them to expect only peaches and 100% fruit

juice, when this is false and misleading, due to the presence of water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives. 21 U.S.C. § 343(a)(1); AGM § 201(1).

95.    The Product is "misbranded" and misleads consumers because "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, causes them to expect only peaches and 100% fruit juice, even though this "fails to reveal facts material in the light of such representations," because in place of peaches and 100% fruit juice, it has substituted water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives. 21 U.S.C. § 343(a)(1); AGM § 201(1); 15 U.S.C. § 55(a)(1).

96.    Substituting water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives, for peaches and 100% fruit juice, is of material interest to consumers, because peaches and 100% fruit juice cost more than these lower quality alternatives.

97.    Substituting water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic

preservatives, for peaches and 100% fruit juice, is of material interest to consumers, because peaches and 100% fruit juice contain more nutrients than these lower quality alternatives.

98.   Substituting water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives, for peaches and 100% fruit juice, is of material interest to consumers, because peaches and 100% fruit juice are natural ingredients, made through simple processes, while juice concentrates, captured oils and essences, and/or preservatives, are made through industrial manufacturing and/or created in laboratories.

99.   The Product is "misbranded" and misleads consumers because "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, fails to prominently and conspicuously reveal facts relative to the proportions or absence of peaches and 100% fruit juice. 21 U.S.C. § 343(a)(1); AGM § 201(1).

100. This is because it fails to disclose that it contains mostly, or at least, a significant percentage, of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives, besides peaches and 100% fruit juice.

101. The Product is "misbranded" and misleading because the name of "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, includes or suggests the ingredients of peaches and 100% fruit juice, but does not include water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives, even though these are identified on the ingredient list in fine print. 21 U.S.C. § 343(a)(1); AGM § 201(1); 21 C.F.R. § 101.18(b).[24]

102. The Product is "misbranded" and misleads consumers because "it purports to be or is represented as a food for which a definition and standard of identity has been prescribed," "Yellow Cling Diced Peaches In 100% Fruit Juice," but does not "conform[] to such definition and standard, [nor does] its label bear[] the name of the food specified in the definition and standard." 21 U.S.C. § 343(g); AGM § 201(7).

103. Since "Yellow Cling Diced Peaches In 100% Fruit Juice" is subject to the "Canned peaches" standard of identity, its labeling is required to conform to this standard. 21 C.F.R. § 145.135.

---

[24] The volatile compounds "added back" to the juice concentrates are not required to be disclosed in the ingredients.

104. Federal and state regulations require that because the Product is represented as "Diced Peaches," yet uses seasoning in the form of lemon juice concentrate, "Diced Peaches" "shall also include…a declaration of any [] seasoning that characterizes [it] for example, 'Seasoned with [lemon juice concentrate],'… [one] of the optional ingredients specified in [21 C.F.R. §§ 145.170(a)(1)(ii), (iii), (iv) and (v)]." 21 C.F.R. § 145.170(a)(4)(i).

105. Federal and state regulations require that "the name of the packing medium specified in [21 C.F.R. § 145.170(a)(3)(i)-(ii)], preceded by 'In' or 'Packed in'…shall be included as part of the name [of Diced Peaches] or in close proximity to the name of [of Diced Peaches]." 21 C.F.R. § 145.170(a)(4)(ii).

106. Since "the liquid portion of the packing media provided for in [21 CFR 145.170(a)(3)(i)-(ii)] consists of" "Fruit juice(s) and water," this must be disclosed as part of the Product's name. 21 C.F.R. § 145.170(a)(4)(ii); 21 C.F.R. § 145.170(a)(3)(i)(b).

107. Since the packing medium includes "White Grape Juice Concentrate [and] Lemon Juice Concentrate," which is "a combination of two or more fruit juices [both] of which are made from concentrate(s), the words 'from concentrate(s)' shall follow the word 'juices(s)' in the name of the packing medium," such as "In White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Fruit Juice From Concentrate." 21 C.F.R. §§ 145.170(a)(4)(ii)(b)-(c).

108. If "In Fruit Juice From Concentrate" was used to describe the packing medium, and "the names of the fruit juices used d[id] not appear in the name of the packing medium as provided in [21 C.F.R. § 145.170(a)(4)(ii)(b)], such names [of white grape juice and lemon juice] and the words 'from concentrate,' as specified in [21 C.F.R. § 145.170(a)(4)(ii)(c)], shall appear in [the Product's] ingredient statement," which they do. 21 C.F.R. § 145.170(a)(4)(iii).

109. Since the packing medium includes "Fruit juice(s) and water," a truthful and non-misleading description of the packing medium could be "In Water, White Grape Juice From Concentrate and Lemon Juice From Concentrate," or "In Water and Fruit Juice From Concentrate," with water listed before fruit juice from concentrate because it is present in a greater amount. 21 C.F.R. § 145.170(a)(3)(i)(b); 21 C.F.R. § 145.170(a)(3)(ii) (describing how water should be disclosed as part of packing medium, but when it contains more fruit juice than water).

110. Though the back label states "In 100% Fruit Juice From Concentrate," consumers making quick purchasing decisions are unlikely to see this.

111. The Product is "misbranded" and misleads consumers because the front label does not contain the "word[s], statement[s], or other information required," as detailed above. 21 U.S.C. § 343(f); AGM § 201(6); 21 C.F.R. §§ 145.170(a)(4)(i)-(ii).

112. To the extent the ingredients other than peaches and fruit juice appear on the back of the package's ingredient list, this does not "render [this] likely to be read and understood by the ordinary individual under customary conditions of purchase and use," because most consumers will not read or look for the ingredients. 21 U.S.C. § 343(f); AGM § 201(6).

113. Instead of "Yellow Cling Diced Peaches," the "word[s], statement[s], or other information required" to describe the name of this food, preceding the packing medium, on the front label, was Yellow Cling Diced Peaches, Seasoned With Lemon Juice Concentrate. 21 C.F.R. § 145.170(a)(4)(i).

114. Instead of "In 100% Juice," the "word[s], statement[s], or other information required" to describe the packing medium, on the front label, were (1) In Water, White Grape Juice From Concentrate and Lemon Juice From Concentrate, or (2) In Water and Fruit Juice From Concentrate. 21 C.F.R. § 145.170(a)(4)(ii).

115. The Product is "misbranded" and misleads consumers because "it bears or contains [the] chemical preservative[s] [of ascorbic acid and citric acid] [and does not] bear[] labeling stating that fact," because even though the ingredient list discloses one function of ascorbic acid with respect to color, this does not "render such statement likely to be read by the ordinary person under customary conditions of purchase and use," because most consumers do not read the fine print ingredients, and/or neither of these ingredients are identified as chemical preservatives. 21

24

U.S.C. § 343(k); AGM § 201(11); 21 C.F.R. § 101.22(d).

116. As a result of the false and misleading representations, the Product is sold at a premium price, approximately $2.09 for four 4 oz cups, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

117. Plaintiff is a citizen of New York.

118. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

119. The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

120. The Court has jurisdiction over Defendant because it transacts business within New York and sells the Product to consumers within New York from its more than 120 Aldi supermarkets and/or online, to citizens of this State.

121. Defendant transacts business in New York, through the sale of the Product to citizens of New York from its more than 120 Aldi supermarkets and/or online, to citizens of this State.

122. Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

123. Defendant has committed tortious acts outside this State by labeling,

representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, attributes, type, origins, amount, and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

124. Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, type, origins, amount, and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

125. Plaintiff resides in Suffolk County.

126. Venue is in this Court because a substantial or entire part of the events or omissions giving rise to Plaintiff's claims occurred in Suffolk County.

127. Venue is in this Court because Plaintiff's residence is in Suffolk County.

128. Plaintiff purchased, used, consumed, and/or applied the Product in reliance on the packaging, labeling, representations, and omissions identified here in Suffolk County.

129. Plaintiff first became aware the packaging, labeling, representations, and omissions, were false and misleading, in Suffolk County.

## PARTIES

130. Plaintiff Nancy Bono is a citizen of Suffolk County, New York.

131. Defendant Aldi Inc. is an Illinois corporation with a principal place of business in Illinois.

132. Aldi is the common brand of two German-owned supermarket chains, with over 10,000 stores in 20 countries and annual sales exceeding $75 billion.

133. Aldi operates more than 2,000 stores across 36 states, and more than 120 locations in New York.

134. Aldi is known for selling the highest quality goods, based on its "no frills" approach which reduces costs, which are passed on to the consumer.

135. While Aldi sells leading national brands of products, it also sells many products under one of its private label brands, Lunch Buddies.

136. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

137. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

138. Products under the Lunch Buddies brand have an industry-wide

reputation for quality.

139. In releasing products under the Lunch Buddies brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

140. Aldi gets national brands to produce its private label items due its loyal customer base and high standards.

141. Private label products under the Lunch Buddies brand benefit by their association with consumers' appreciation for the Aldi brand overall.

142. That Lunch Buddies-branded products satisfy this high bar was or would be proven by focus groups, which rated or would rate them equal to or above their name brand equivalent.

143. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Lunch Buddies] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

144. Private label products generate higher profits for retailers like Aldi, because national brands spend significantly more on marketing, contributing to their higher prices.

145. The result is that private label products can be sold at relatively lower costs compared to national brands.

146. The development of private label items is a growth area for Aldi, as they

select only top suppliers to develop and produce Lunch Buddies products.

147. Plaintiff is like most consumers who tries to buy foods which (1) contain fewer ingredients, (2) prominently represent they contain 100% of their promoted ingredients, i.e., "100% fruit juice," (3) contain the types of ingredients they are familiar with and will have at home, like peaches and 100% fruit juice, instead of lower quality ingredients, like water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives, (4) do not contain additives that are manufactured in laboratories, and/or (5) do not contain ingredients made through industrial machinery and which are not fresh.

148. Plaintiff is like most consumers and looks to the front label of foods to see what she is buying and to learn basic information about it.

149. Plaintiff is like most consumers who tries to avoid additives based on the belief that they are potentially harmful, not natural, and unhealthy.

150. Plaintiff understood "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, to mean only peaches in fruit juice, without water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic

29

preservatives.

151. Plaintiff understood 100% fruit juice to mean only not from concentrate fruit juice, because in her experience, the use of juice concentrate is typically disclosed on a product's label.

152. Plaintiff read, saw, and relied on the packaging and labeling of "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices.

153. Plaintiff bought the Product with the labeling and packaging identified here, "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, at around the above-referenced price.

154. Plaintiff purchased the Product between March 2021 and March 2024, at one or more Aldi stores in New York.

155. Plaintiff did not expect that in addition to the pictured peaches and 100% fruit juice, the Product's main liquid ingredient would not be fruit juice but water.

156. Plaintiff did not expect the fruit juice used would be juice concentrate,

from which the water was removed, along with nutrients and other attributes.

157. Plaintiff did not expect that in addition to peaches and 100% fruit juice, the Product would contain additives, like flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives.

158. Plaintiff paid more for the Product than she would have had she known (1) it did not contain only peaches and fruit juice, because it had water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, (2) the second most predominant ingredient was not fruit juice, but water, and/or (3) the juice was juice concentrate, as she would not have bought it or would have paid less.

159. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

160. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

## CLASS ALLEGATIONS

161. Plaintiff seeks to represent the following class:

> All persons in New York who purchased the Product in New York during the statutes of limitations for each cause of action alleged, expecting it to contain only peaches and fruit

> juice, instead of also water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives.

162. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

163. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

164. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

165. Plaintiff is an adequate representative because her interests do not conflict with other members.

166. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

167. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

168. The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and labeling identified here, at over 120 Aldi grocery stores in New York and online, to citizens of this State.

169. Plaintiff's Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
General Business Law ("GBL") §§ 349 and 350

170. Plaintiff incorporates by reference paragraphs 1-116.[25]

171. The purpose of the GBL is to protect consumers against unfair and deceptive practices.

172. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

173. The GBL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

174. Violations of the GBL can be based on other laws and standards related to consumer deception.

175. Violations of the GBL can be based on the principles of the Federal

---

[25] To the extent any incorporation by reference is required.

Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

176. A GBL violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., are violated.

177. A GBL violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

178. A GBL violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

179. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

180. In considering whether a food's label is misleading, it is required to consider not only representations made or suggested by statements, images, and/or design, but also the extent to which this fails to prominently and conspicuously reveal facts relative to (1) the proportions or absence of certain ingredients, and/or (2) other facts concerning its attributes and characteristics, such as ingredients, quantity, origin, type, and/or quality, which are of material interest to consumers.

181. Defendant's false and deceptive representations and omissions with respect to the Product's contents, ingredients, and quality, that it consisted only of peaches and 100% fruit juice, are material in that they are likely to influence consumer purchasing decisions.

182. This is because consumers prefer foods with the wholesome, natural, nutritious, and recognizable ingredients promoted on the Product's front label, peaches and 100% fruit juice, instead of having those ingredients replaced with water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives.

183. The replacement of peaches and 100% fruit juice with water, juice concentrates, flavoring, seasoning, and synthetic preservatives, is of material interest to consumers, because (1) they prefer foods with fewer ingredients, which are less processed, (2) the former ingredients cost more than the latter, (3) they seek to avoid lower quality ingredients, like water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives, and/or (4) they seek foods described as "100%," consisting of only and entirely the food or ingredient connected with this figure, for reasons related to health, nutrition, taste, and/or quality.

184. The Product could have included more peaches and 100% fruit juice but added water, juice concentrates, flavorings, such as captured and/or restored volatile

compounds and essential oils, seasoning, and synthetic preservatives, because they cost less and/or substituted for the highlighted ingredients of peaches and 100% fruit juice.

185. The labeling of the Product violated the FTC Act and thereby violated the GBL because the representations, omissions, packaging, and labeling, "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, created the erroneous impression it contained only peaches and 100% fruit juice, when this was false, because it contained mostly or a significant quantity of unexpected ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives.

186. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, immoral, and/or unconscionable acts or practices, intended to protect the public, thereby violating the GBL.

187. Violations of the GBL can be based on public policy, established by norms, customs, statutes, law, or regulations.

188. The labeling of the Product violated the GBL because the representations, omissions, labeling, and packaging, "Yellow Cling Diced Peaches

In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, when it did not contain only peaches and 100% fruit juice, but also water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives, was unfair and deceptive to consumers.

189. The labeling of the Product violated the GBL because the representations, omissions, packaging, and labeling of "Yellow Cling Diced Peaches In 100% Fruit Juice," in single-serving transparent cups, visibly filled with peaches and what appears to be "100% Fruit Juice," next to a freshly picked peach with its stem intact, as if it were recently plucked from a tree, and freshly cut peach slices, even though it contained mostly unexpected ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and/or synthetic preservatives, was contrary to the AGM, which adopted the FFDCA and accompanying regulations, indicated below.

| Federal | State |
|---|---|
| 21 U.S.C. § 342(b)(1) | AGM § 200(7) |
| 21 U.S.C. § 342(b)(2) | AGM § 200(8) |
| 21 U.S.C. § 342(b)(3) | AGM § 200(9) |

| | |
|---|---|
| 21 U.S.C. § 342(b)(4) | AGM § 200(10) |
| 21 U.S.C. § 343(a)(1) | AGM § 201(1) |
| 21 U.S.C. § 343(f) | AGM § 201(6) |
| 21 U.S.C. § 343(g) | AGM § 201(7) |
| 21 U.S.C. § 343(k) | AGM § 201(11) |
| 21 C.F.R. § 101.18(b) | 1 N.Y.C.R.R. § 259.1(a) |
| 21 C.F.R. § 101.22(d) | |
| 21 C.F.R. § 145.170(a)(4)(i) | 1 N.Y.C.R.R. § 250.1(a) |
| 21 C.F.R. § 145.170(a)(4)(ii) | |

190. Plaintiff believed the Product contained only peaches and 100% fruit juice, even though it contained mostly or a significant amount of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives.

191. Plaintiff paid more for the Product and would not have paid as much if she knew that it did not contain only peaches and 100% fruit juice, but contained mostly or a significant amount of other ingredients, including water, juice concentrates, flavorings, such as captured and/or restored volatile compounds and essential oils, seasoning, and synthetic preservatives.

192. Plaintiff seeks to recover for economic injury, financial damages and/or economic loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the GBL.

193. Plaintiff will produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and other advanced methodologies.

194. As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered economic and financial damages by payment of a price premium for the Product, which is the difference between what she paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, and/or marketing identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as Counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   April 23, 2024

Respectfully submitted,

/s/  Spencer Sheehan

Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

Spencer Sheehan

Sheehan & Associates P.C.

*Counsel for Plaintiff*

**Certificate of Service**

I certify that on April 23, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | CM/CEF | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

_____/s/ Spencer Sheehan_____